IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
Western Division
No. 5:15-CV-00292

| | | |
|---|---|---|
| THOMPSON AUTOMOTIVE LABS, LLC, | ) ) ) | |
| Plaintiff, | ) ) | **COMPLAINT** |
| v. | ) ) | |
| ILLINOIS TOOL WORKS, INC. | ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) | |

Thompson Automotive Labs, LLC, complaining of defendant Illinois Tool Works, Inc., hereby alleges as follows:

## NATURE OF ACTION

1.      This is an action by Thompson Automotive Labs, LLC ("Thompson Automotive Labs") against Illinois Tool Works, Inc. ("ITW") for, *inter alia,* ITW's failure to make over $3 million in required purchases of an automotive diagnostic tool developed by Thompson Automotive Labs that is known as the Combustion Performance Test (or CPT) Tool, breaching an Exclusive Supply Agreement between them.  After Thompson Automotive Labs rejected ITW's low-ball offer to purchase the Combustion Performance Test Tool technology, ITW wrongfully purported to terminate the Exclusive Supply Agreement with Thompson Automotive Labs in order to execute a scheme that ITW secretly developed to displace Thompson Automotive Labs' Combustion Performance Test Tool in the marketplace with its own directly competitive product.  Around the time that ITW announced its competitive product, ITW also issued to potential purchasers a statement about the accuracy of results reported by Thompson

1

Automotive Labs' Combustion Performance Test Tool that, upon information and belief, was false. ITW then proceeded to market and to sell its competitive product using false and misleading advertising and using trademarks and trade dress that infringed upon Thompson Automotive Labs' trademarks and trade dress. ITW also routinely represented its marks to be federally-registered when they were not. Thompson Automotive Labs therefore asserts, in addition, claims for trademark infringement, false advertising, and unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.* Thompson Automotive Labs seeks to recover from ITW compensatory damages, profits generated through its false and misleading advertising and the infringement of Thompson Automotive Labs' trademarks and trade dress, treble damages, prejudgment interest, postjudgment interest, costs and attorneys' fees. Thompson Automotive Labs also seeks permanent injunctive relief enjoining ITW from infringement of Thompson Automotive Labs' trademarks and trade dress, from engaging in false and misleading advertising in connection with the marketing, offer for sale and sale of its competing product, and from falsely marking any of its trademarks as federally-registered when, in fact, they are not.

## PARTIES

2.     Plaintiff Thompson Automotive Labs, LLC ("Thompson Automotive Labs") is a limited liability company organized under the laws of the State of North Carolina with a principal place of business located in Fuquay-Varina, North Carolina. Thompson Automotive Labs' sole member, John Thompson, is a resident and citizen of the State of North Carolina.

3.     Upon information and belief, defendant Illinois Tool Works, Inc. ("ITW") is a corporation organized under the laws of the State of Delaware with a principal place of business located in Glenview, Illinois.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(a)(1), in that this is an action between citizens of different States and the amount in

controversy, exclusive of interest and costs, exceeds $75,000.   This Court also has subject

matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367, in that (a) this action

involves claims arising under the laws of the United States and (b) the other claims asserted

herein are so related to the claims arising under the laws of the United States that they form a

part of the same case or controversy under Article III of the United States Constitution.

5.     This Court may exercise personal jurisdiction over ITW in this action pursuant to

N.C. Gen. Stat. §1-75.4 and consistent with the United States Constitution because, *inter alia:*

(a) ITW has applied for and holds a certificate of authority from the Secretary of State of

North Carolina to conduct business within the State of North Carolina;

(b) ITW has appointed CT Corporation System, 150 Fayetteville Street, Suite 1011,

Raleigh, North Carolina 27601 as its agent for the service of process in North Carolina;

(c) ITW is engaged in substantial activity within the State of North Carolina, including in

connection with the matters alleged herein: (i) visits to North Carolina by ITW employees for

meetings with Thompson Automotive Labs personnel for the purpose of conducting ITW's

business; (ii) placement of telephone calls by ITW employees to Thompson Automotive Labs

personnel located in North Carolina for the purpose of conducting ITW's business; (iii)

transmission of e-mail by ITW employees to Thompson Automotive Labs personnel located in

North Carolina for the purpose of conducting ITW's business; (iv) transmission of orders by

ITW employees to Thompson Automotive Labs in North Carolina for the purchase of goods

produced in North Carolina; (v) mailing of payments by ITW employees to Thompson

Automotive Labs personnel located in North Carolina; (vi) ITW's advertising and offer for sale of its AutoEKG Product in North Carolina; (vii) ITW's advertising and offer for sale of its AutoEKG Product in North Carolina using infringing trademarks as alleged herein, which ITW also represented as federally-registered when, in fact, they were not; (viii) ITW's appointment of one or more distributors in North Carolina for ITW automotive products marketed and sold under the Wynn's and QMI brands; and (ix) ITW's employment of one or more employees in North Carolina engaged in marketing and selling ITW automotive products marketed and sold under the Wynn's and QMI brands;

(d) this action relates, in part, to goods shipped and to be shipped from North Carolina to ITW on its order or direction;

(e) upon information and belief, at the time of the injuries complained of herein, solicitation or service activities were carried on by or on behalf of ITW in North Carolina, including but not limited to marketing, sale and advertising of ITW's AutoEKG product and ITW automotive products marketed and sold under the Wynn's and QMI brands; and

(f) upon information and belief, at the time of the injuries complained of herein, products, services or things processed, serviced or manufactured by ITW were used or consumed within North Carolina in the ordinary course of trade, including but not limited to ITW automotive products marketed and sold under the Wynn's and QMI brands.

6. Venue for this action is proper in this judicial district pursuant to 28 U.S.C. § 1391 because ITW is subject to personal jurisdiction in this judicial district with respect to this action.

## FACTUAL BACKGROUND

7.     Thompson Automotive Labs is a North Carolina-based developer of automotive diagnostic tools and a provider of technical training on a variety of subjects relating to automobile engines.

8.     Thompson Automotive Labs' founder, John Thompson, has been awarded U.S. Patent No. 7,031,828 entitled "Engine Misfire Detection System," a patent directed to a technique for detecting which cylinder in an engine is misfiring and detecting other combustion inefficiencies.  Mr. Thompson has been certified as an ASE Master Technician by the National Institute for Automotive Service Excellence and is a member of the Society of Automotive Engineers.  He also is a Contributing Editor of Motor Magazine. He has authored multiple articles concerning automotive engine performance, including *Shots in the Dark: Engine Misfire Diagnosis* (Motor Magazine, November 2006); *Go With the Flow: Basic Fuel System Analysis* (Motor Magazine, July 2007); and *Carbon Deposits: Cleaning Up What's Left Behind* (Motor Magazine, May 2008).

### Thompson Automotive Labs' Development of its Combustion Performance Testing Tool

9.     On February 8, 2010, Thompson Automotive Labs entered into Software, Goods and Services Agreement No. 0903154 (the "Jiffy Lube Agreement") with Jiffy Lube International, Inc. ("Jiffy Lube Int'l"), which has more than 2,000 franchised Jiffy Lube® automobile service centers in North America.  Under the Jiffy Lube Agreement, Thompson Automotive Labs agreed to develop and to deliver to Jiffy Lube Int'l a prototype of a software application tool to analyze a vehicle's relative combustion efficiency in order to demonstrate to Jiffy Lube® customers the need or value of performing a fuel system cleaning on their vehicles. Thompson Automotive Labs also agreed in the Jiffy Lube Agreement that Jiffy Lube Int'l would

5

enjoy an exclusive license to the software application tool for a period of six (6) months following Thompson Automotive Labs' receipt of Jiffy Lube Int'l's first payment under the Jiffy Lube Agreement. The Jiffy Lube Agreement provided that the exclusivity period could be extended by Jiffy Lube Int'l for two (2) additional periods of three (3) months each.

10.     Thompson Automotive Labs received Jiffy Lube Int'l's first payment under the Jiffy Lube Agreement on April 2, 2010. Thus, the initial exclusivity period under the Jiffy Lube Agreement extended through and including October 2, 2010. During 2010 and 2011, Thompson Automotive Labs and Jiffy Lube Int'l agreed to a number of extensions of the exclusivity period which extended it through December 31, 2012.

11.     In 2010, Thompson Automotive Labs delivered to Jiffy Lube Int'l test data generated using the algorithm developed by Thompson Automotive Labs for use in the prototype of the software application tool.

12.     During 2010, Jiffy Lube Int'l's parent, Shell Oil Company ("Shell"), conducted a statistical analysis of the data generated by Thompson Automotive Labs' algorithm to determine the reliability of the combustion efficiency results reported by the algorithm. Shell's analysis confirmed that the algorithm's assessment of vehicle combustion efficiency was reliable and unlikely to produce either false negative or false positive results.

13.     By late 2010, Thompson Automotive Labs had decided to identify and to advertise to Jiffy Lube outlets the combustion efficiency testing service provided by Thompson Automotive Labs' algorithm as a "Combustion Performance Test" or "CPT," and it began to refer to the tool that would run Thompson Automotive Labs' algorithm as the "Combustion Performance Test Tool" or "CPT tool."

6

14.    In 2010, Thompson Automotive Labs decided to identify and to advertise to Jiffy Lube outlets the Combustion Performance Test Tool and the Combustion Performance Test that it performed using a shield logo that featured an EKG-style isoelectric or trace line (the "EKG Line Design"):



A copy of the foregoing shield logo incorporating the EKG Line Design is attached hereto as Exhibit 1.  Thompson Automotive Labs also decided to identify and to advertise to Jiffy Lube outlets the Combustion Performance Test Tool and the Combustion Performance Test that it performed using the shield logo in conjunction with "CPT":



A copy of the foregoing shield logo incorporating the EKG Line Design appearing in conjunction with "CPT" is attached hereto as Exhibit 2.  The EKG Line Design was selected as an element of the logo to identify and to advertise the Combustion Performance Test Tool and the Combustion Performance Test service because the actual engine combustion event plot measured by the Combustion Performance Test Tool in many instances resembles closely the isoelectric or trace line generated by an EKG.  The selection of the EKG Line Design to identify and to market the Combustion Performance Test Tool and the Combustion Performance Test

7

service invokes a medical/diagnostic metaphor linking the human heartbeat (which is measured by an EKG) with the "heartbeat" of an automobile's engine (which is measured by the Combustion Performance Test Tool).

15. During early 2011, with Jiffy Lube Int'l's cooperation, the Combustion Performance Test Tool was field-tested at a number of Jiffy Lube® stores in different parts of the United States. The Combustion Performance Test service was identified and advertised in those Jiffy Lube® stores using posters, flyers, and other promotional materials that included the shield logo incorporating the EKG Line Design. As the following photo demonstrates, the Combustion Performance Test Tool developed by Thompson Automotive Labs to perform the Combustion Performance Test service also was identified in the Jiffy Lube® field tests using the shield logo incorporating the EKG Line Design:



A copy of the foregoing photo of the Combustion Performance Test Tool is attached hereto as Exhibit 3.

16.     Most of the Jiffy Lube® stores where the Combustion Performance Test Tool was field-tested increased their sales of fuel system cleaning services to their customers, resulting in increases in their gross revenues and profits. Based upon the positive results of the Jiffy Lube® field tests, Jiffy Lube Int'l invited Thompson Automotive Labs in May 2011 to demonstrate and to sell the Combustion Performance Test Tool to Jiffy Lube® franchisees at the Jiffy Lube® convention in Chicago in September 2011.

17.     In June 2011, Jiffy Lube Int'l suggested to Thompson Automotive Labs that it might consider partnering with a larger company with established contacts among Jiffy Lube® franchisees in order to speed commercialization of the new Combustion Performance Test Tool within the Jiffy Lube® franchisee network and, ultimately, in the broader quick-lube market. Jiffy Lube Int'l provided to Thompson Automotive Labs a list of potential partners for its consideration and offered to introduce some or all of them to Thompson Automotive Labs. Among the companies that Jiffy Lube Int'l identified to Thompson Automotive Labs for consideration as a potential partner was ITW. One of the ITW contacts that Jiffy Lube Int'l identified to Thompson Automotive Labs was Dave Prange from the QMI/Full Throttle Division of ITW.

**ITW and Thompson Automotive Labs Begin Discussions**

18.     In July 2011, Jiffy Lube Int'l introduced Thompson Automotive Labs and its Combustion Performance Test Tool by e-mail to a number of companies, including ITW. Near the end of July 2011, Dave Prange from ITW telephoned Thompson Automotive Labs in North Carolina and asked to visit with Thompson Automotive Labs in North Carolina for a

demonstration of the Combustion Performance Test Tool and to explore a potential relationship between ITW and Thompson Automotive Labs.

19.     On August 16, 2011, ITW employees Dave Prange, Bill Crowe and Alan Ferry traveled to North Carolina and met with Thompson Automotive Labs in Morrisville, North Carolina.  During that meeting, Thompson Automotive Labs provided ITW with a number of PowerPoint presentations describing Thompson Automotive Labs' history, the Combustion Performance Test Tool, and its development.  Thompson Automotive Labs also demonstrated the Combustion Performance Test Tool to Mr. Prange, Mr. Crowe and Mr. Ferry.

20.     One of the PowerPoint presentations provided to ITW during its August 16, 2011 visit to Thompson Automotive Labs pointed out that the "CPT tool is like an EKG for an engine."  Another PowerPoint slide shown to ITW was entitled "EKG for an Engine," and it specifically analogized the output of the Combustion Performance Test Tool to an EKG isoelectric or trace line:



A copy of the foregoing "EKG for an Engine" PowerPoint slide shown to Mr. Prange, Mr. Crowe and Mr. Ferry during their August 16, 2011 visit to Thompson Automotive Labs in North Carolina is attached hereto as Exhibit 4.

21. Thompson Automotive Labs also showed to ITW a PowerPoint slide depicting the shield logo and EKG Line Design that had been used and were intended to be used by Thompson Automotive Labs to identify, market, promote and advertise to Jiffy Lube outlets the Combustion Performance Test Tool and the Combustion Performance Test service that it provided:



A copy of the foregoing PowerPoint slide shown to Mr. Prange, Mr. Crowe and Mr. Ferry during their August 16, 2011 visit to North Carolina is attached hereto as Exhibit 5.

22. The Combustion Performance Test Tool that TAL demonstrated to ITW on August 16, 2011 depicted the shield logo and EKG Line Design as shown in the photograph of the Combustion Performance Test Tool attached hereto as Exhibit 3.

23.     On August 25, 2011, Mr. Prange e-mailed to Thompson Automotive Labs' Art

Mealer, located in North Carolina, an outline of terms for an agreement between ITW and

Thompson Automotive Labs in which ITW proposed to act as "the exclusive fuel system

cleaning chemical and Master Distributor partner for the introduction of the CPT diagnostic tool

to the Jiffy Lube system through Dec 2012 and then for the worldwide Automotive Aftermarket

afterwards."  A copy of the e-mail from Mr. Prange (ITW) to Mr. Mealer (Thompson

Automotive Labs) dated August 25, 2011 (as forwarded by Mr. Mealer to Mr. Thompson) is

attached hereto as Exhibit 6.

24.     On September 13, 2011, Mr. Crowe e-mailed to Thompson Automotive Labs in

North Carolina a proposed letter of intent for an agreement between ITW and Thompson

Automotive Labs.  A copy of the e-mail from Mr. Crowe (ITW) to Mr. Thompson, Mr. Horlbeck

and Mr. Mealer (Thompson Automotive Labs) dated September 13, 2011 is attached hereto as

Exhibit 7.

25.     On September 15 through 19, 2011, Thompson Automotive Labs attended the

Jiffy Lube® Convention in Chicago, where Thompson Automotive Labs demonstrated its

Combustion Performance Test Tool and offered it for sale to Jiffy Lube® franchisees.  In

anticipation of a relationship with ITW, Thompson Automotive Labs referred potential

purchasers of its Combustion Performance Test Tool to ITW's booth, where ITW personnel

received orders for the Combustion Performance Test Tool from Jiffy Lube® franchisees.  The

artwork displayed at the Thompson Automotive Labs booth, where at least one ITW employee

was present with Thompson Automotive Labs personnel during most of the convention,

announced to prospective purchasers that the Combustion Performance Test Tool was "Like an

EKG for an Engine," and it displayed the shield logo incorporating the EKG Line Design, as well as the EKG Line Design standing alone:



A copy of the foregoing Thompson Automotive Labs booth art from the Jiffy Lube® Convention in Chicago on September 15-19, 2011 is attached as Exhibit 8.  A photograph of the Thompson Automotive Labs booth from the Jiffy Lube® Convention on September 15-19, 2011 is attached as Exhibit 9.

26.     On September 26, 2011, Mr. Crowe and Mr. Prange again traveled to North Carolina and inspected GRT Electronics' facility in Raleigh, North Carolina where Thompson Automotive Labs' Combustion Performance Test Tool was planned to be manufactured.

**The TAL-ITW Exclusive Supply Agreement**

27.     On September 27, 2011, Mr. Crowe e-mailed Eric Horlbeck, another of the principals at Thompson Automotive Labs, in North Carolina to provide an update on ITW's preparation of a formal agreement between ITW and Thompson Automotive Labs.  That e-mail revealed ITW's interest in purchasing Thompson Automotive Labs and its Combustion Performance Test Tool, as Mr. Crowe wrote: "I would be interested to know if you folks have a number in mind for buyout."  A copy of the e-mail from Mr. Crowe (ITW) to Mr. Horlbeck

(Thompson Automotive Labs) dated September 27, 2011 is attached to the e-mail from Mr. Horlbeck to Mr. Crowe dated September 28, 2011 as Exhibit 10.

28.     On September 28, 2011, Mr. Thompson and Mr. Horlbeck received in North Carolina ITW's proposed draft Exclusive Supply Agreement with Thompson Automotive Labs. A copy of the e-mail from Mr. Crowe (ITW) to Mr. Thompson and Mr. Horlbeck (Thompson Automotive Labs) dated September 28, 2011 and transmitting ITW's proposed draft Exclusive Supply Agreement is attached as Exhibit 11.

29.     On November 7, 2011, after extensive negotiations, ITW and Thompson Automotive Labs executed an Exclusive Supply Agreement (the "Exclusive Supply Agreement") dated as of October 14, 2011, a copy of which is attached as Exhibit 12.  In the Exclusive Supply Agreement, ITW agreed to honor Thompson Automotive Labs' Jiffy Lube Agreement by selling the Combustion Performance Test Tool in North America only to Jiffy Lube® franchisees during the exclusivity period agreed upon between Jiffy Lube Int'l and Thompson Automotive Labs.

### September 2011 – February 2012

30.     Under the Exclusive Supply Agreement, ITW (referred to as "Buyer" or "QMI") agreed, *inter alia,* as follows:

> QMI shall purchase 100 units per month from September 27, 2011 to February 29, 2012 (the "Quota Period").  For the avoidance of doubt, September 27, 2011 through October 31, 2011 shall be treated as one month for purposes of the 100 unit commitment described above.  In the event that QMI does not purchase at least 100 units of Product in any month during the Quota Period, QMI shall pay Thompson, within five (5) business days after the end of such month, an amount equal to (a) $3,300, multiplied by (b) the difference of 100 minus the number for Products actually purchased by QMI during such month.  QMI shall purchase 500 units over this five month period.  QMI will have the right to order additional units per month if needed, but will not otherwise be obligated to purchase more than the 500 units during the Quota Period.

31.     On or about September 26, 2011, ITW sent to Thompson Automotive Labs in North Carolina PO #2630 to purchase 40 Combustion Performance Test Tools.  The Combustion Performance Tools that ITW ordered under PO #2630 were shipped to ITW from North Carolina, and they were received by ITW in Illinois on or about October 20, 2011.

32.     On or about October 10, 2011, ITW sent to Thompson Automotive Labs in North Carolina PO #2684 to purchase 76 Combustion Performance Test Tools.  The Combustion Performance Test Tools that ITW ordered under PO #2684 were shipped to ITW from North Carolina, and they were received by ITW in Illinois on or about December 7, 2011.

33.     On or about October 10, 2011, ITW sent to Thompson Automotive Labs in North Carolina PO #2683 to purchase 124 Combustion Performance Test Tools.  The Combustion Performance Test tools that ITW ordered under PO #2683 were shipped to ITW from North Carolina, and ITW received them in Illinois as follows: 19 Combustion Performance Test Tools on or about December 7, 2011; 8 Combustion Performance Test Tools on or about December 14, 2011; 26 Combustion Performance Test Tools on or about January 5, 2012, 1 Combustion Performance Test Tool on or about January 6, 2012; and 70 Combustion Performance Test Tools on or about January 9, 2012.

34.     ITW did not order any Combustion Performance Test Tools from Thompson Automotive Labs during November 2011, nor did ITW make any payment of money to Thompson Automotive Labs in respect of its purchase quota for that month.

35.     On December 6, 2011, ITW sent to Thompson Automotive Labs in North Carolina PO #2914 to purchase 100 Combustion Performance Test Tools.  The Combustion Performance Test Tools that ITW ordered under PO #2914 were shipped to ITW from North Carolina, and ITW received them in Illinois as follows: 35 Combustion Performance Test Tools

on or about January 9, 2012; and 65 Combustion Performance Test Tools on or about January 18, 2012.

36.     ITW did not order any Combustion Performance Test Tools from Thompson Automotive Labs during January 2012. Near the end of that month, however, Thompson Automotive Labs offered to allow ITW to wait to send its next PO for a few weeks in order to permit Thompson Automotive Labs to make some engineering adjustments to its Combustion Performance Test Tool before filling additional orders.

37.     During January 2012, ITW inquired once again about terms for purchasing the Combustion Performance Test Tool technology from Thompson Automotive Labs. On January 30, 2012, Mr. Crowe e-mailed to Mr. Thompson and Mr. Horlbeck in North Carolina that he was "doing some financial modeling so that we can have a starting point regarding a purchase price for the CPT technology." He asked, "Can you please tell me where you stand regarding the patent rights of the technology?" He also asked, "Can you disclose the cost of the CPT unit?" He explained to Mr. Thompson and Mr. Horlbeck that "[o]ur model would assume acquiring the technology and purchasing the CPT unit direct," which "directly impacts the profitability of the business and therefore the value of the offer." A copy of the e-mail dated January 30, 2012 from Mr. Crowe (ITW) to Mr. Thompson and Mr. Horlbeck (Thompson Automotive Labs) is attached hereto as Exhibit 13.

38.     On January 31, 2012, after Thompson Automotive Labs provided information to ITW about its cost to manufacture the Combustion Performance Test Tool, Mr. Crowe e-mailed Mr. Horlbeck in North Carolina about ITW's projections for its sales of the Combustion Performance Test Tool: "Regarding 2013 unit projections, if we get the same kind of reception with our other key accounts that we experienced with Jiffy Lube, we could easily do 2,400 units

with sustainable growth." A copy of the e-mail dated January 31, 2012 from Mr. Crowe (ITW) to Mr. Horlbeck (Thompson Automotive Labs) is attached hereto as Exhibit 14.

39. On February 8, 2012, Darren Farrugia, the Group General Manager of the ITW division known as ITW ProAP, e-mailed to Mr. Thompson and Mr. Horlbeck in North Carolina that ITW was interested in entering into an arrangement with Thompson Automotive Labs to acquire the Combustion Performance Test Tool technology in exchange for an upfront payment (in an amount to be determined) and payment of a per unit royalty on future sales. Mr. Farrugia also confirmed that he, Mr. Prange and John Hartnett (the Group President of ITW ProAP) had made plans to travel to North Carolina to meet with Mr. Thompson and Mr. Horlbeck on February 27, 2012 to discuss ITW's acquisition of the Combustion Performance Test Tool technology. A copy of the e-mail dated February 8, 2012 from Mr. Farrugia (ITW) to Mr. Thompson and Mr. Horlbeck (Thompson Automotive Labs) is attached hereto as Exhibit 15.

40. On February 16, 2012, ITW sent to Thompson Automotive Labs in North Carolina PO #3451 to purchase 200 Combustion Performance Test Tools for a total purchase price of $660,000. ITW did not, however, remit to Thompson Automotive Labs 50% of the purchase price with PO #3451, as required by Section 5 of the Exclusive Supply Agreement, promising instead to "get a check cut for 50% of this order and have it mailed out to you ASAP." A copy of the e-mail dated February 16, 2012 from Jennifer Aburto (ITW) to Mr. Thompson (Thompson Automotive Labs) (with PO #3451 attached) is attached hereto as Exhibit 16.

41. On February 27, 2012, Mr. Farrugia, Mr. Prange, Mr. Hartnett and Mr. Ferry of ITW traveled to North Carolina to meet with Mr. Thompson and Mr. Horlbeck of Thompson Automotive Labs in Morrisville, North Carolina to discuss terms for ITW's acquisition of the Combustion Performance Test Tool technology from Thompson Automotive Labs. That

morning, Thompson Automotive Labs received in the mail ITW's check no. 87913 in the amount of $330,000, representing remittance of 50% of the initial amount due on PO #3451. A copy of ITW's check no. 87913 made payable to Thompson Automotive Labs in the amount of $330,000 is attached hereto as Exhibit 17. Later that day, when the meeting between ITW and Thompson Automotive Labs convened, ITW conveyed a verbal offer to purchase the Combustion Performance Test Tool technology from Thompson Automotive Labs for $3 million. In view of the fact that ITW was then obligated to purchase over $3 million worth of Combustion Performance Test Tools from Thompson Automotive Labs under the Exclusive Supply Agreement before the end of 2012, as well as ITW's projection for its sales of Combustion Performance Test Tools in 2013, Mr. Thompson and Mr. Horlbeck declined ITW's $3 million offer.

42.     Just minutes after the meeting ended and Mr. Farrugia, Mr. Prange and Mr. Hartnett left, Mr. Thompson received an e-mail in North Carolina from Mr. Prange advising that the recent PO from ITW had been cancelled. Mr. Prange also advised Thompson Automotive Labs not to cash any check it might receive from ITW because ITW's accounting department had placed a stop payment order on it. A copy of the e-mail dated February 27, 2012 from Mr. Prange (ITW) to Mr. Thompson (Thompson Automotive Labs) is attached as Exhibit 18.

43.     When the Quota Period under the Exclusive Supply Agreement ended on February 29, 2012, ITW had purchased from Thompson Automotive Labs and had paid for 340 Combustion Performance Test Tools, 160 fewer than the Exclusive Supply Agreement obligated ITW to purchase during the Quota Period.

**March 2012 – June 2012**

44.     Under the Exclusive Supply Agreement, ITW agreed, *inter alia*, as follows

concerning Combustion Performance Test Tool purchases from March through June 2012:

> From March 1, 2012 through June 30, 2012, QMI shall purchase 100 units per
> month, unless QMI notifies Thompson of its intent to opt out of the minimum
> purchase obligations by December 1, 2011.  In the event that QMI does not opt
> out by December 1, 2011 yet fails to purchase at least 100 units of Product in any
> month from March 1, 2012 through June 30, 2012, QMI shall pay to Thompson,
> within five (5) business days after the end of such month, an amount equal to (a)
> $3,300, multiplied by (b) the difference of 100 minus the number of Products
> actually purchased by QMI during such month.

ITW did not notify Thompson Automotive Labs of its intent to opt out of the minimum purchase

obligations for 2012 by December 1, 2011.

45.     On March 10, 2012, after a telephone conversation with Mr. Thompson and Mr.

Horlbeck earlier in the week in which they discussed durability issues with the Combustion

Performance Test Tool being reported by some Jiffy Lube® franchisees, Mr. Prange e-mailed to

Mr. Thompson and Mr. Horlbeck in North Carolina to reassure them that "all of us here at ITW

are confident you can put the durability issues on your tool to rest in short order."  Nevertheless,

Mr. Prange demanded that ITW be relieved from its minimum purchase obligations under the

Exclusive Supply Agreement: "We look to Thompson Labs to extend our exclusivity for 3-6

months and eliminate the guarantees required."  A copy of the e-mail dated March 10, 2012 from

Mr. Prange (ITW) to Mr. Thompson and Mr. Horlbeck (Thompson Automotive Labs) is attached

hereto as Exhibit 19.

46.     Thompson Automotive Labs agreed to extend ITW's exclusive access to the

Combustion Performance Test Tool for 3 months to March 31, 2013.  Thompson Automotive

Labs did not, however, agree to ITW's proposal to eliminate its minimum purchase obligations

under the Exclusive Supply Agreement. Rather, on March 26, 2012, Mr. Horlbeck e-mailed to

Mr. Prange regarding an adjustment to ITW's minimum purchase obligations:

> As we discussed, TAL is willing to defer your monthly minimum order requirements for the first four months of this year, and extend the contract's overall term from December 31 of this year to March 31, 2013. Practically, this means that your order commitment described in section 2 of Schedule A to the Supply agreement from January 1, 2012 through November 30, 2012 are each shifted by four months and now apply from May 1, 2012 through March 31, 2013. The commitment for December 2012 will be waived; the Jiffy Lube franchisee mandate date would also shift from June 30 to September 30 of this year. As discussed, there would no longer be any minimum order requirements in the months of January, February, March and April this year.
>
> The above solution gives you 3 months of additional exclusivity and a decrease of a month's equivalent in total sales. This is what we can do for you in order to meet your concern to defer commitments for now. Once we get a couple months farther down the road, we will also be happy to discuss the minimum commitments with you if you are still concerned about meeting the agreed minimums once they restart in May.

A copy of the e-mail dated March 26, 2012 from Mr. Horlbeck (Thompson Automotive Labs) to

Mr. Prange (ITW) is attached hereto as Exhibit 20.

47.     ITW agreed with Thompson Automotive Labs on the modifications to the

Exclusive Supply Agreement set forth in the March 26, 2012 e-mail from Mr. Horlbeck to Mr.

Prange.

48.     ITW did not order any Combustion Performance Test Tools from Thompson

Automotive Labs during March 2012.

49.     ITW did not order any Combustion Performance Test Tools from Thompson

Automotive Labs during April 2012.

50.     ITW resumed ordering Combustion Performance Test Tools from Thompson

Automotive Labs in May 2012. On May 14, 2012, ITW sent to Thompson Automotive Labs in

North Carolina PO #4272 to purchase 100 Combustion Performance Test Tools for a total price

of $330,000. ITW asked to receive 50 Combustion Performance Test Tools "asap" and the other

50 Combustion Performance Test Tools on May 31, 2012, if possible. In the cover e-mail

transmitting the PO to Thompson Automotive Labs, Jennifer Aburto wrote: "I am working on

getting you the 50% down payment and will have it sent to you asap." A copy of the e-mail

dated May 14, 2012 from Ms. Aburto (ITW) to Mr. Thompson (Thompson Automotive Labs)

(with ITW PO #4272 attached) is attached hereto as Exhibit 21.

 51. On May 14, 2012, Mr. Thompson e-mailed Ms. Aburto to request a signed copy

of PO #4272 for Thompson Automotive Labs' records when she sent ITW's check for the 50%

down payment on PO #4272. A copy of the e-mail dated May 14, 2012 from Mr. Thompson

(Thompson Automotive Labs) to Ms. Aburto (ITW) is attached hereto as Exhibit 22. On May

15, 2012, Ms. Aburto responded: "That is not a problem. I will send po along with the check."

A copy of the e-mail dated May 15, 2012 from Ms. Aburto (ITW) to Mr. Thompson (Thompson

Automotive Labs) is attached hereto as Exhibit 23. Notwithstanding Ms. Aburto's promise,

Thompson Automotive Labs did not receive from ITW a check for payment of any amount due

under PO #4272.

 52. On May 21, 2012, Ms. Aburto e-mailed Mr. Thompson in North Carolina: "Please

hold off on shipping the 50 units of the CPT Tools that are due on May 31st. I will let you know

when we would like to have those shipped to us." A copy of the e-mail dated May 21, 2012

from Ms. Aburto (ITW) to Mr. Thompson (Thompson Automotive Labs) is attached hereto as

Exhibit 24.

 53. On May 22, 2012, Mr. Prange e-mailed Mr. Thompson and Mr. Horlbeck in

North Carolina to request that they call him later that day. A copy of the e-mail dated May 22,

2012 from Mr. Prange (ITW) to Mr. Thompson and Mr. Horlbeck (Thompson Automotive Labs)

is attached hereto as Exhibit 25. When Mr. Thompson and Mr. Horlbeck spoke by telephone with Mr. Prange that day, Mr. Prange told them that ITW wanted to continue selling the Combustion Performance Test Tool but did not want to be held to the minimum purchase requirements in the Exclusive Supply Agreement. Mr. Prange offered to relinquish ITW's exclusivity rights to the Combustion Performance Test Tool under the Exclusive Supply Agreement in exchange for Thompson Automotive Labs' agreement to dispense with ITW's minimum purchase requirements. Mr. Thompson and Mr. Horlbeck told Mr. Prange that they needed to discuss the situation before making any response.

54. Later that day, Mr. Thompson e-mailed Ms. Aburto, writing as follows: "OK, just so I'm clear you have already cut and mailed the check for P.O. 4272 and you want 50 kits shipped asap and to hold off on the other 50 kits until we hear back from you. Do I have that right?" A copy of the e-mail dated May 22, 2012 from Mr. Thompson (Thompson Automotive Labs) to Ms. Aburto (ITW) is attached hereto as Exhibit 26. The next morning Ms. Aburto e-mailed Mr. Thompson to respond: "Yes that is correct." A copy of the e-mail dated May 23, 2012 from Ms. Aburto (ITW) to Mr. Thompson (Thompson Automotive Labs) is attached hereto as Exhibit 27. TAL did not receive a check from ITW for payment of amounts due under PO #4272. Upon information and belief, Ms. Aburto's e-mail dated May 23, 2012 was false, in that ITW had not mailed Thompson Automotive Labs a check in payment of PO #4272.

55. On May 25, 2012, Ms. Aburto e-mailed Mr. Thompson in North Carolina and wrote: "I need to cancel purchase order #4272 until all original tool replacements have been completed. I apologize for the inconvenience." Ms. Aburto enclosed with her e-mail a copy of PO #4272 bearing the endorsement "CANCELLED." A copy of the e-mail dated May 25, 2012

from Ms. Aburto (ITW) to Mr. Thompson (Thompson Automotive Labs) is attached hereto as Exhibit 28.

56.     On May 31, 2012, Mr. Horlbeck e-mailed Jennifer Bonacio (Aburto) to transmit Thompson Automotive Labs Invoice #1878 in the amount of $108,900 for ITW's shortfall in meeting its May 2012 monthly minimum purchase requirement under the Exclusive Supply Agreement.  A copy of the e-mail dated May 31, 2012 from Mr. Horlbeck (Thompson Automotive Labs) to Ms. Bonacio (Aburto) (ITW) (with Thompson Automotive Labs Invoice #1878 attached) is attached hereto as Exhibit 29.

57.     Prior to sending Thompson Automotive Labs' Invoice #1878 to ITW, Mr. Horlbeck e-mailed Mr. Prange to ask if he could be available for a short call that day to follow up on their last discussion.   In his e-mail, Mr. Horlbeck stated: "According to our contract, we need to send you an invoice for May and I want to make sure we are on the same page." Mr. Horlbeck advised in his e-mail that ITW's payment would be due and payable on June 7, 2012 pursuant to the Exclusive Supply Agreement.  A copy of the e-mail dated May 31, 2012 at 11:41 a.m from Mr. Horlbeck (Thompson Automotive Labs) to Mr. Prange (ITW) is attached hereto as Exhibit 30.  Later that day, Mr. Prange responded by e-mail: "On vacation until Tuesday.  Let's talk then."  A copy of the e-mail dated May 31, 2012 at 2:41 p.m. from Mr. Prange (ITW) to Mr. Horlbeck (Thompson Automotive Labs) is attached hereto as Exhibit 31.  Mr. Horlbeck replied by e-mail: "Sure. What times could you be available?"  A copy of the e-mail dated May 31, 2012 at 6:45 p.m. from Mr. Horlbeck (Thompson Automotive Labs) to Mr. Prange (ITW) is attached hereto as Exhibit 32.

**ITW Purports to Terminate the Exclusive Supply Agreement**

58.     On June 4, 2012, Mr. Prange e-mailed to Mr. Horlbeck in North Carolina that he would be traveling back to Chicago the next day and promised: "I will email you both when my timing clears up.  Later in the day, I will be settled back in Chicago."  A copy of the e-mail dated June 4, 2012 from Mr. Prange (ITW) to Mr. Horlbeck (Thompson Automotive Labs) is attached hereto as Exhibit 33.  Mr. Prange did not contact Mr. Horlbeck to set up a call as promised.

59.     On June 6, 2012, Mr. Horlbeck e-mailed Mr. Prange to ask: "Can you be available to talk today at 4 pm EDT?"  A copy of the e-mail from Mr. Horlbeck (Thompson Automotive Labs) to Mr. Prange (ITW) dated June 6, 2012 at 12:53 p.m. is attached hereto as Exhibit 34. Mr. Prange responded by e-mail: "I will be tied up today and Thursday is an all day meeting and travel . . . how about Friday?"  A copy of the e-mail dated June 6, 2012 at 2:38 p.m. from Mr. Prange (ITW) to Mr. Horlbeck (Thompson Automotive Labs) is attached hereto as Exhibit 35. Later that afternoon, Mr. Horlbeck responded" "Can we set aside a time on Friday between 9:30am-11:30am EDT?"  A copy of the e-mail dated June 6, 2012 at 4:01 p.m. from Mr. Horlbeck (Thompson Automotive Labs) to Mr. Prange (ITW) is attached hereto as Exhibit 36. Mr. Prange responded by e-mail the following day: "I would like Darren [Farrugia] to join us and Friday doesn't work.  Let me get back to you at the start of the week."  A copy of the e-mail dated June 7, 2012 from Mr. Prange (ITW) to Mr. Horlbeck (Thompson Automotive Labs) is attached hereto as Exhibit 37.

60.     Upon information and belief, at the time that Thompson Automotive Labs was attempting unsuccessfully to schedule a call with ITW in early June 2012 to discuss their Exclusive Supply Agreement, ITW had already developed or was developing a secret plan to terminate its relationship with Thompson Automotive Labs and to launch its own competitive

product that ITW intended to displace Thompson Automotive Labs' Combustion Performance Test Tool in the quick-lube market and to usurp Thompson Automotive Labs' goodwill. Unbeknownst to Thompson Automotive Labs, ITW filed an application on June 6, 2012 with the United States Patent and Trademark Office ("USPTO") to register AUTOMOTIVE EKG for use on or in connection with "equipment for analyzing automotive exhaust" (the "AUTOMOTIVE EKG Trademark Application"). The AUTOMOTIVE EKG Trademark Application filed by ITW stated: "Intent to Use: The applicant has a bona fide intent to use or use through the applicant's related company or licensee the mark in commerce on or in connection with the identified goods and/or services." Upon information and belief, as of June 6, 2012, ITW had a bona fide intent to use or use through a related company or licensee the mark AUTOMOTIVE EKG in connection with equipment for analyzing automotive exhaust. A copy of U.S. Trademark Application Serial No. 85645012 is attached hereto as Exhibit 38. At no time did ITW disclose to Thompson Automotive Labs that it had filed the AUTOMOTIVE EKG Trademark Application, nor did ITW ever discuss with Thompson Automotive Labs the possible use of AUTOMOTIVE EKG as a trademark in connection with the advertising or sale of Thompson Automotive Labs' Combustion Performance Test Tool. Rather, upon information and belief, the "equipment for analyzing automotive exhaust" referenced in ITW's statement of its intent to use AUTOMOTIVE EKG as a trademark was a competitive product that ITW had decided to launch to displace Thompson Automotive Labs' Combustion Performance Tool in the quick-lube market and to usurp Thompson Automotive Labs' goodwill.

61. ITW did not pay Thompson Automotive Labs' Invoice #1878 by June 7, 2012.

62. Unable to arrange a call with Mr. Prange to discuss the Exclusive Supply Agreement, Mr. Horlbeck e-mailed Mr. Prange and Mr. Farrugia on June 8, 2012 to provide "an

update on the details of where we are and what we are doing this Summer." One of the topics on which Mr. Horlbeck provided an update was Thompson Automotive Labs' success in addressing previous reports concerning Combustion Performance Test Tool failures in the field:

> The latest data on Gen 3 devices that have been in the QMI system for over a month reveals a device failure rate of 1.7% (2.5% if you include a defective charger). While we recognize that we need more time to fully understand how they are holding up, this is already significantly better than any of our previous releases and well below the 5% rate that Shell is looking for this year.

Mr. Horlbeck wrote that Thompson Automotive Labs wanted "to discuss if we are going to modify our contract and if so, how that will be handled," and Mr. Horlbeck proposed a discussion during the week of June 18, 2012. A copy of the e-mail dated June 8, 2012 from Mr. Horlbeck (Thompson Automotive Labs) to Mr. Prange (ITW) and Mr. Faruggia (ITW) is attached hereto as Exhibit 39.

63. Neither Mr. Prange nor Mr. Faruggia responded to Mr. Horlbeck's e-mail dated June 8, 2012. On June 18, 2012, Mr. Horlbeck e-mailed Mr. Prange and Mr. Faruggia and asked, "What are some times that you and Darren could be available to talk this week?" A copy of the e-mail from Mr. Horlbeck (Thompson Automotive Labs) to Mr. Prange (ITW) and Mr. Faruggia (ITW) is attached hereto as Exhibit 40. Continuing to resist Mr. Horlbeck's efforts to arrange a discussion about the Exclusive Supply Agreement, Mr. Prange e-mailed to Mr. Horlbeck in North Carolina on June 19, 2012 and wrote: "I will check with Darren and get back to you." A copy of the e-mail dated June 19, 2012 from Mr. Prange (ITW) to Mr. Horlbeck (Thompson Automotive Labs) is attached hereto as Exhibit 41. Mr. Prange did not get back to Mr. Horlbeck with available times for a call as promised.

64.    On June 25, 2012, Mr. Prange e-mailed to Mr. Thompson and Mr. Horlbeck in North Carolina a letter in which ITW wrongfully purported to terminate the Exclusive Supply Agreement effective June 26, 2012.  In the letter, Mr. Prange wrote:

> Per Section 6 of the agreement, you warranted that the Products would be free from defects in material and workmanship and under normal use and service.  To date the Products have failed to meet this representation and we deem this failure to be a material breach of your contract obligations.
>
> . . .
>
> Pursuant to Section 7(a) of the agreement ITW has the right to terminate this agreement for cause should the breaching party (Thompson) default in the performance of any of their representations and obligations in this agreement and such default has not been cured within 10 business days after notice from the non-defaulting party.  ITW first notified you of the breach verbally 03/09/12.

A copy of the e-mail dated June 25, 2012 from Mr. Prange (ITW) to Mr. Thompson and Mr. Horlbeck (Thompson Automotive Labs) (with attached letter) is attached hereto as Exhibit 42.

65.    ITW's purported termination of the Exclusive Supply Agreement was wrongful. At the time of ITW's purported termination of the Exclusive Supply Agreement, Thompson Automotive Labs had fully performed its obligations under the Exclusive Supply Agreement, unlike ITW.  Contrary to ITW's assertion, ITW did not notify Thompson Automotive Labs of any alleged breach of the Exclusive Supply Agreement on March 9, 2012 or at any time thereafter.

66.    ITW purported to terminate the Exclusive Supply Agreement even though Jiffy Lube® franchisees using the TAL CPT tool enjoyed substantial increases in fuel system cleaning sales.  According to ITW, sales results almost always doubled, but sales often quadrupled and more.  Further, according to ITW, at least one Jiffy Lube ®franchisee saw a percentage of sales increase of 18% over a three month period.

67.     Notwithstanding ITW's purported termination of the Exclusive Supply

Agreement on June 25, 2012, ITW continued to engage with Thompson Automotive Labs as if

the Exclusive Supply Agreement remained in full force and effect.  For example, on June 27,

2012, the day after ITW's purported termination of the Exclusive Supply Agreement supposedly

became effective, ITW employee Ellie Pentland (who was copied on ITW's purported notice of

termination to Thompson Automotive Labs) e-mailed Mr. Thompson in North Carolina to ask

"whether or not an LCD window can be replaced if someone breaks it?  If not, how much would

it cost to do that for a customer who dropped their tool into their lower tool bay?"  A copy of the

e-mail dated June 27, 2012 from Ms. Pentland (ITW) to Mr. Thompson (Thompson Automotive

Labs) is attached hereto as Exhibit 43.  Mr. Thompson responded by e-mail later that day:

"Replacing just the screen on the device your customer dropped into the lower bay is not

possible."  A copy of the e-mail dated June 27, 2012 from Mr. Thompson (Thompson

Automotive Labs) to Ms. Pentland (ITW) is attached hereto as Exhibit 44.

68.     On June 28, 2012, Ms. Pentland again e-mailed Mr. Thompson, Mr. Horlbeck and

Art Mealer in North Carolina to ask "who would be meeting with Jeff Jones and the STC Jiffy

Lube group on July 6th?"  "Jeff Jones and the STC Jiffy Lube group" referenced in Ms.

Pentland's e-mail were ITW customers who had leased from ITW Combustion Performance Test

Tools  produced by Thompson Automotive Labs.  A copy of the e-mail dated June 28, 2012 at

1:20 p.m. from Ms. Pentland (ITW) to Mr. Thompson, Mr. Horlbeck and Mr. Mealer (Thompson

Automotive Labs) is attached hereto as Exhibit 45.  Mr. Horlbeck responded: "John and I will be

there.  Any advice on how to help?"  A copy of the e-mail dated June 28, 2012 from Mr.

Horlbeck to Ms. Pentland is attached hereto as Exhibit 46.  Ms. Pentland replied by e-mail sent

to North Carolina later that day: "They likely will have a lot of durability questions.  Also,

remember they all have gen 3 tools as we did a complete swap out for already [sic]. They can be a tough crowd but they're awesome! I look forward to hearing how it goes!! Thanks and have a great rest of your day!" A copy of the e-mail dated June 28, 2012 at 5:06 p.m. from Ms. Pentland (ITW) to Mr. Horlbeck and Mr. Thompson (Thompson Automotive Labs) is attached hereto as Exhibit 47.

69.     On July 3, 2012, Mr. Thompson wrote to ITW and Mr. Prange to dispute the propriety of ITW's purported termination of the Exclusive Supply Agreement. Responding to Mr. Prange's letter purporting to terminate the Exclusive Supply Agreement, Mr. Thompson wrote:

> Thompson disagrees with both the assertions in the letter and the conclusion of the letter. The products Thompson provided to QMI were not defective. All product units passed inspection and functional tests before leaving Thompson's facility. And, to the extent any products had problems initially due to unanticipated use or otherwise, Thompson replaced the products or corrected the problems in fulfillment of its obligations under Section 6 of the Agreement. QMI has in fact failed to fulfill its obligations and commitments under the Agreement despite Thompson's good faith efforts to work with QMI.

A copy of the letter dated July 3, 2012 from Mr. Thompson to QMI and Mr. Prange is attached hereto as Exhibit 48.

70.     Notwithstanding ITW's purported termination of the Exclusive Supply Agreement effective June 26, 2015, Ms. Pentland told Mr. Thompson during July 2012 that she had just signed up two more Jiffy Lube® franchisees to lease Combustion Performance Test Tools from ITW. ITW also continued during July and August 2012 to request shipment of Combustion Performance Test Tools from TAL and to avail itself of the limited repair/replacement remedy under Section 6 of the Exclusive Supply Agreement by returning Generation 1 Combustion Performance TestTools to Thompson Automotive Labs to be replaced with Generation 3 Combustion Performance Test Tools. On or about July 27, 2012, for example,

Thompson Automotive Labs received a box of Generation 1 Combustion Peformance Test Tools that ITW had shipped to North Carolina because it wanted Thompson Automotive Labs to replace them with Generation 3 Combustion Performance Test Tools.  On July 31, 2012, Ms. Pentland e-mailed Mr. Thompson in North Carolina to "see when the next 20 tools for Gen 3 swap outs will be shipped to me?!"  A copy the e-mail dated July 31, 2012 from Ms. Pentland (ITW) to Mr. Thompson (Thompson Autmotive Labs) is attached hereto as Exhibit 49.  Around the same time, Ms. Pentland shipped to North Carolina an additional 6 Generation 1 Combustion Performance Test Tools for replacement by Thompson Automotive Labs with Generation 3 Combustion Performance Test Tools.  In response to ITW's request, Thompson Automotive Labs shipped 24 Generation 3 Combustion Performance Test Tools from North Carolina to ITW in Illinois on or about August 2, 2012 to replace Generation 1 Combustion Performance Test Tools previously purchased by ITW.  On or about August 15, 2012, Ms. Pentland sent 2 more Generation 1 Combustion Performance Test Tools to Thompson Automotive Labs in North Carolina to be replaced by Thompson Automotive Labs with Generation 3 Combustion Performance Test Tools.  On or about August 9, 2012, Thompson Automotive Labs sent 9 Generation 3 Combustion Performance Test Tools from North Carolina to ITW in Illinois to replace Generation 1 Combustion Performance Test Tools being returned to Thompson Automotive Labs by ITW.  Later during August 2012, ITW returned additional Generation 1 Combustion Performance Test Tools to Thompson Automotive Labs in North Carolina for replacement with Generation 3 Combustion Performance Test Tools.

**ITW's Recall of Thompson Automotive Labs' Combustion Performance Test Tools**

71.    During late August 2012, Thompson Automotive Labs learned from Jiffy Lube Int'l that ITW had developed a plan to release a statement that Thompson Automotive Labs'

Combustion Performance Test Tool did not work properly, after which ITW planned to release its own product to compete with Thompson Automotive Labs' Combustion Performance Test Tool.

72.     On August 27, 2012, more than two months after ITW purported to terminate the Exclusive Supply Agreement, Thompson Automotive Labs discovered that Mr. Prange had registered for a webinar being conducted by Thompson Automotive Labs for customers later that day concerning the Combustion Performance Test Tool.  Mr. Prange did not contact Thompson Automotive Labs about the webinar before registering.  Upon learning of his registration, Mr. Thompson e-mailed Mr. Prange on August 27, 2012 to advise: "These Webinars do not refer or relate to ITW.  Given ITW's breaches of its obligations under its contract with TAL, we do not believe that your attendance would be appropriate."  A copy of the e-mail dated August 27, 2012 at 7:43 a.m. from Mr. Thompson (Thompson Automotive Labs) to Mr. Prange (ITW) is attached hereto as Exhibit 50.  Mr. Prange responded by e-mail as follows: "We still own and service approximately 340 units.  The agenda notes show support areas that we should know about.  Our exclusion will only hurt the Jiffy Lube customers we service.  Instead of getting 3rd party accounts of the discussions, it only helps to hear things from the horse's mouth."  A copy of the e-mail dated August 27, 2012 at 7:50 a.m. from Mr. Prange (ITW) to Mr. Thompson (Thompson Automotive Labs) is attached hereto as Exhibit 51.  Mr. Thompson replied: "I am glad to hear that you will continue to support your existing customers with the TAL CPT tool. We will also continue to support your efforts to do so.  To that end, please feel free to attend the Webinars." A copy of the e-mail dated August 27, 2012 at 7:58 a.m. from Mr. Thompson (Thompson Automotive Labs) to Mr. Prange (ITW) is attached hereto as Exhibit 52.  Notwithstanding Mr. Thompson's invitation to attend, Mr. Prange e-mailed Mr. Thompson to state: "I decided not to

attend at your request.  I will not be attending this afternoon as well.  We will always do the right

thing by the end users."  A copy of the e-mail from Mr. Prange (ITW) to Mr. Thompson (TAL)

dated August 27, 2012 at 9:13 a.m. is attached hereto as Exhibit 53.  Mr. Prange did not attend

the webinars.

73.    On August 28, 2012, Thompson Automotive Labs received word from Jiffy Lube

Int'l that ITW was planning to issue a statement that it did not believe in the efficacy of

Thompson Automotive Labs' Combustion Performance Test Tool.  Thompson Automotive

Labs' counsel e-mailed ITW's counsel immediately about "information [TAL] has received that

ITW is preparing to issue some sort of statement suggesting that the TAL tool doesn't work."

Thompson Automotive Labs' counsel advised that "TAL stands behind its product and

vigorously disputes any contention that its tool does not work as advertised."  Thompson

Automotive Labs' counsel "strongly urge[d] ITW to reconsider that course" and "reserve[d] all

rights that [TAL] has or may have to the extent that ITW pursues the issuance of such a

statement."  A copy of the e-mail dated August 28, 2012 from K. Alan Parry (Thompson

Automotive Labs counsel) to Marsha Tolchin (ITW counsel) is attached hereto as Exhibit 54.

74.    Despite the warning from Thompson Automotive Labs' counsel, on August 30,

2012, ITW issued a recall of all Combustion Performance Test Tools that it had leased to Jiffy

Lube® franchisees.  According to a release to Jiffy Lube® franchisees issued by Jiffy Lube Int'l,

"QMI/ITW's reasoning is that 'After technical testing by our lab . . . we no longer have

confidence in the readings the units provide.'"  A copy of the release from Jiffy Lube Int'l to

Jiffy Lube® franchisees dated August 30, 2012 is attached hereto as Exhibit 55.   The

announcement that ITW was recalling Thompson Automotive Labs' Combustion Performance

Test Tools because ITW supposedly had no confidence in their readings came only days after

Mr. Prange had attempted to join the Thompson Automotive Labs webinar about the Combustion Peformance Test Tool and had reported to Mr. Thompson that ITW still had 340 units that it was servicing. At no time before or after ITW's recall of the Thompson Automotive Labs' Combustion Performance Test Tools has ITW shared with Thompson Automotive Labs any information concerning its supposed "technical testing by our lab" of the Combustion Performance Test Tool or the results thereof.

### ITW Launches and Markets Its AutoEKG Product

75.     In November 2012, confirming the report that Thompson Automotive Labs had received from Jiffy Lube Int'l several months earlier, Thompson Automotive Labs learned that ITW had developed and was offering to Jiffy Lube® franchisees a product known as "AutoEKG" that was directly competitive with Thompson Automotive Labs' Combustion Performance Test Tool for assessing a vehicle's need for fuel system cleaning (the "AutoEKG Product"). The AutoEKG Product featured a probe inserted into the vehicle's tailpipe, like the Combustion Performance Test Tool, in order to collect engine performance information used to assess the vehicle's need for fuel system cleaning. Also, like the Combustion Performance Test Tool, the AutoEKG Product used a scale of 1 to 10 and a graduated red-yellow-green color scheme to report results generated by the AutoEKG Product assessing the vehicle's need for fuel system cleaning. Attached as Exhibit 56 is a copy of an image of the AutoEKG product that Thompson Automotive Labs received in November 2012. As the image attached as Exhibit 56 shows, ITW displayed on the AutoEKG Product the word AUTOEKG together with a yellow isoelectric line such as would be generated in connection with an EKG test.

76.     Attached as Exhibit 57 is a copy of a marketing brochure for ITW's AutoEKG Product dated 2012 and entitled "Introducing AUTOEKG™ Fuel System Analyzer."  The brochure displays the following mark:



(the "AutoEKG Mark").  The AutoEKG Mark includes the word "AutoEKG" as well as a yellow isoelectric line such as would be generated in connection with an EKG test.

77.     This brochure announced that the AutoEKG Product was a "PROVEN PROFIT PROGRAM," stating: "During our recent fuel diagnostic field tests in over 300 oil change centers nationwide, participating outlets more than doubled their fuel system sales."  Upon information and belief, this statement was materially false and misleading when made.  The statement communicates to an ordinary reader that ITW had run diagnostic field tests of the AutoEKG Product in over 300 oil change centers nationwide, but, upon information and belief, ITW had not, at that time, run diagnostic field tests of the AutoEKG Product in over 300 oil change centers nationwide.  Rather, upon information and belief, ITW's statement actually concerned results experienced by participating Jiffy Lube® franchisees utilizing the Combustion Performance Test Tool produced by Thompson Automotive Labs.

78.     The brochure also included the following testimonial attributed to Paul A. Phillips, Director of Operations, Trenner Group: "Three of my shops experienced a twofold increase in fuel system services performed, when each vehicle is tested and the results presented to the drivers.  Proper and consistent presentation of the diagnostic findings raised our averages

34

for FSC [fuel system cleaning] from 4-4.5% to 9.5-10%. Thank you for your products and support." Upon information and belief, ITW's inclusion of this testimonial in its brochure about the AutoEKG Product was materially false and misleading. The testimonial communicates to the ordinary reader that the results described were based upon the Trenner Group's deployment of the AutoEKG Product, but, upon information and belief, the results described in the testimonial were actually based upon the Trenner Group's deployment of the Combustion Performance Test Tool produced by Thompson Automotive Labs.

79. The brochure's depiction of the AutoEKG Mark in conjunction with the symbol "®" also was false and misleading when the brochure was published. At that time, ITW had not applied for and had not received from the USPTO a federal trademark registration for AUTOEKG or the AutoEKG Mark.

80. In the January 2013 issue of *National Oil & Lube News*, Mr. Prange published in his monthly column an article entitled "Opportunity Knocking. The Future Is Now." In that article, Mr. Prange wrote: "Today I get to introduce you to the most exciting breakthrough I have seen in my 25 years in the quick lube business." The subject of the article was what Mr. Prange referred to as "The AutoEKG Fuel System Analyzer® for data-driven diagnosis™." In his article, Mr. Prange asserted that the "concept of data-driven diagnosis has a proven track record in more than 340 quick lube centers." Mr. Prange claimed that "Sales results almost always doubled, but sales often quadrupled and more. The highest percentage of sales I saw was about 18 percent over a three-month period. Where does the increase come from? The system simplifies the presentation, and consumers love and trust technology." Urging readers to contact ITW for a demonstration of the AutoEKG Product, Mr. Prange asserted: "Demand has been high." The article specifically identifies Mr. Prange's affiliation with ITW: "Mr. Prange is with

ITW ProAp, suppliers of Full Throtte [sic], Heartland and RainX products to the fast lube industry." On the facing page was a full-page advertisement for ITW's AutoEKG Product proclaiming that "[o]ur new technology will revolutionize fuel system cleaning sales." The advertisement depicted the AutoEKG Mark featuring a yellow isoelectric line such as would be generated by an EKG test. It also depicted an image of the AutoEKG Product bearing the AutoEKG Mark. A copy of Mr. Prange's article "Opportunity Knocking. The Future is Now." from the January 2013 issue of *National Oil & Lube News,* together with the advertisement for the AutoEKG Product appearing on the facing page, is attached hereto as Exhibit 58.

81. Upon information and belief, Mr. Prange's article "Opportunity Knocking. The Future is Now." was materially false and misleading when it was published. The statement in the article that "the concept of data-driven diagnosis has a proven track record in more than 340 quick lube centers," as well as the statements in the article about increases in fuel system cleaning sales, communicate to the ordinary reader that the results described were based upon deployment of the AutoEKG Product. However, upon information and belief, the results described by Mr. Prange were actually based upon deployment of the Combustion Performance Test Tool produced by Thompson Automotive Labs. Prior to ITW's purported termination of the Exclusive Supply Agreement, ITW purchased from Thompson Automotive Labs 340 Combustion Performance Test Tools, the exact number of quick lube centers that Mr. Prange identified as the basis for the claim that the AutoEKG Product had a proven track record of data-driven diagnosis. Further, upon information and belief, demand for the AutoEKG Product, upon information and belief, had not been high and was not high as of the date of publication of the article. In addition, Mr. Prange's use of "The AutoEKG Fuel System Analyzer®" in conjunction with the symbol "®" was false and misleading when the article was published. At that time,

ITW had not applied for and had not received from the USPTO a federal trademark registration for THE AUTOEKG FUEL SYSTEM ANALYZER.

82.     In a 16-page document used by ITW to market its AutoEKG Product entitled "Test Report" – which is dated January 30, 2013 and says it was prepared by the ITW Professional Automotive Products Research and Development Department – the AutoEKG Mark is displayed at the top of every page.  In each instance, the AutoEKG Mark is shown in conjunction with the "®" symbol. Such use of the AutoEKG Mark by ITW in its "Test Report" for the AutoEKG Product was false and misleading.  At that time, ITW had not applied for and had not received from the USPTO a federal trademark registration for the AutoEKG Mark.  The "Test Report" also prominently displays at the top of each page the words "AutoEKG® Fuel System Analyzer," and the "Test Report" states that "AutoEKG® Fuel System Analyzer" is a registered trademark of ITW."  This statement, as well as the display of "AutoEKG® Fuel System Analyzer," were false and misleading when the "Test Report" was published.  At that time, ITW had not applied for and had not received from the USPTO a federal registration for AUTOEKG or AUTOEKG FUEL SYSTEM ANALYZER.  A copy of the ITW "Test Report" dated January 30, 2013 is attached hereto as Exhibit 59.

83.     ITW's use of AUTOEKG and the AutoEKG Mark expanded thereafter.  Attached as Exhibit 60 are numerous promotional materials that ITW used to market and to sell its AutoEKG Product and that it recommended for purchasers, lessees and other users of its AutoEKG Product to use in advertising fuel system analysis services provided by the AutoEKG Product.  These promotional materials, some or all of which were offered by ITW through its "AutoEKG® Point of Sale Fulfillment Program" at www.tbpfulfillment.com and/or offered as

the "AutoEKG® Literature Kit" at www.itwprint.com, display the AutoEKG Mark as shown immediately below:



In every instance in which the AutoEKG Mark was displayed on the promotional materials prepared by ITW that are attached at Exhibit 60, the AutoEKG Mark is shown in conjunction with the symbol "®" even though the AutoEKG Mark and AUTOEKG were not federally-registered trademarks. Many of the materials used by ITW to market and to sell its AutoEKG Product and recommended by ITW for use by purchasers, lessees and other users of the AutoEKG Product (*e.g.,* "Vehicle Health Report" #9M9040, "FAQ Booklet" #9M9038, "Quick-Lube Industry Sales Sheet – Embry" #9M9068, "Consumer Brochure" #9M9041, "Counter Mat – Adhesive Style" #9M9043, and "Dual-Sided Window Cling" #9M9036) specifically state: "AutoEKG is a registered trademark of ITW" or "AutoEKG® Fuel System Analyzer is a registered trademark of ITW." These statements were false and misleading when these materials were published, because AUTOEKG and AUTOEKG FUEL SYSTEM ANALYZER were not at that time federally registered as trademarks with the USPTO.

84. Upon information and belief, in 2012, ITW registered the domain name www.autoekg.com and thereafter began to promote its AutoEKG Product via an internet website at that address. Upon information and belief, during 2013, ITW advertised its AutoEKG Product at www.autoekg.com using AUTOEKG, the AutoEKG Mark, and the phrase "AutoEKG® Fuel

System Analyzer," all of which were displayed on the site using the "®" symbol even though they had not been federally registered as trademarks with the USPTO. At www.autoekg.com, ITW also stated that "AutoEKG® Fuel System Analyzer is a registered trademark of ITW." This statement was false and misleading because AUTOEKG and AUTOEKG FUEL SYSTEM ANALYZER were not federally registered as trademarks with the USPTO.

85. Upon information and belief, ITW began in 2013 to promote its AutoEKG Product through videos published on the internet at www.youtube.com. For example, in a video entitled "AutoEKG Fuel System Analyzer" published on YouTube on October 1, 2013, ITW promoted its AutoEKG Product using AUTOEKG and the AutoEKG Mark. AUTOEKG and the AutoEKG Mark are shown in the "AutoEKG Fuel System Analyzer" video in conjunction with the "®" symbol, even though AUTOEKG and the AutoEKG Mark were not federally registered as trademarks with the USPTO. ITW's video entitled "AutoEKG Deployment Administration," published on YouTube on July 1, 2013, also displays AUTOEKG and the AutoEKG Mark in connection with ITW's AutoEKG Product. AUTOEKG and the AutoEKG Mark are shown in the "AutoEKG Deployment Administration" video in conjunction with the "®" symbol, but AUTOEKG and the AutoEKG Mark were not federally registered as trademarks with the USPTO.

86. Upon information and belief, in 2013, ITW introduced to its sales force an iPad app for them to show to prospective customers to promote ITW's AutoEKG Product. That app displayed the AutoEKG Mark, the word "AutoEKG®," and the words "AutoEKG® Fuel System Analyzer." The AutoEKG Mark, AUTOEKG and AUTOEKG FUEL SYSTEM ANALYZER were shown in the app in conjunction with the "®" symbol. However, the AutoEKG Mark,

AUTOEKG and AUTOEKG FUEL SYSTEM ANALYZER were not federally registered as trademarks with the USPTO.

87.     ITW also continued during 2013 to promote its AutoEKG Product to potential customers in the quick-lube business with reference to sales and revenue data that, upon information and belief, were generated using the Combustion Performance Test Tool produced by Thompson Automotive Labs, not the AutoEKG Product.  For example, in ITW's "Quick-Lube Industry Sales Sheet" #9M9068, which is dated "5/29/13," ITW described its AutoEKG Product as a "PROVEN PROFIT PROGRAM," proclaiming: "During our recent fuel diagnostic field tests in over 300 oil change centers nationwide, **participating outlets more than doubled their fuel system service sales.**" (emphasis in original).  Upon information and belief, this statement was false and misleading.  As in Mr. Prange's "Opportunity Knocking. The Future Is Now." article, the reference to fuel system service sales in ITW's "Quick-Lube Industry Sales Sheet" #9M9068 communicates to the ordinary reader that the stated data relates to the AutoEKG Product, but, upon information and belief, it actually relates to quick-lube outlets' experience with the Combustion Performance Test Tool produced by Thompson Automotive Labs.  A copy of the "Quick-Lube Industry Sales Sheet" #9M9068 is attached hereto as Exhibit 61.

88.     On July 24, 2014, ITW filed an application with the USPTO to register AUTOEKG as a trademark for use in connection with "[e]quipment for analyzing engine exhaust, namely, computers, sensors and antennae."  A copy of ITW's application for registration of AUTOEKG is attached hereto as Exhibit 62.  The specimen that ITW included in its application is a photograph of its AutoEKG Product displaying AUTOEKG and the AutoEKG Mark.  AUTOEKG and the AutoEKG Mark shown in the specimen are displayed with the "®"

symbol, but ITW had not received a registration from the USPTO for AUTOEKG or the AutoEKG Mark. A copy of the specimen that ITW included in its application is attached hereto as Exhibit 63. When ITW submitted another specimen to the USPTO on February 26, 2015, ITW submitted a frame from its YouTube video entitled "AutoEKG Deployment Administration." A copy of the substitute specimen submitted to the USPTO by ITW is attached hereto as Exhibit 64. As noted above, in that video, AUTOEKG and the AutoEKG Mark are shown in conjunction with the "®" symbol even though ITW had received no federal trademark registration from the USPTO for AUTOEKG or the AutoEKG Mark.

89.     Upon information and belief, ITW has not informed the USPTO that it has used AUTOEKG, AUTOEKG FUEL SYSTEM ANALYZER, THE AUTOEKG FUEL SYSTEM ANALYZER and the AutoEKG Mark in conjunction with the "®" symbol in the absence of any federal trademark registration for same issued by the USPTO.

90.     Upon information and belief, even though numerous ITW personnel were present at the Jiffy Lube® Convention in 2011 when Thompson Automotive Labs employed LIKE AN EKG FOR AN ENGINE and the EKG Line Design to promote and sell the Combustion Performance Test Tool, ITW has not informed the USPTO of Thompson Automotive Labs' use of LIKE AN EKG FOR AN ENGINE or the EKG Line Design to promote and sell equipment for analyzing automobile engine exhaust and automobile engine combustion efficiency prior to ITW's first claimed use of AUTOEKG.

91.     Upon information and belief, ITW has not informed the USPTO that the same video from which the substitute specimen is taken displays AUTOEKG and the AutoEKG Mark in conjunction with the "®" symbol even though ITW has received no federal registration from the USPTO for AUTOEKG or the AutoEKG mark.

92.     Commencing before ITW's first claimed use of AUTOEKG, and continuing

through the filing of this action, Thompson Automotive Labs has identified, advertised,

promoted and marketed its Combustion Performance Test Tool using the mark LIKE AN EKG

FOR AN ENGINE.  Commencing before ITW's first use of the AutoEKG Mark, and continuing

through the filing of this action, Thompson Automotive Labs also has identified, advertised,

promoted and marketed its Combustion Performance Test Tool using the EKG Line Design.

93.     As of the filing of this action, ITW continues to market its AutoEKG product

using the AutoEKG Mark, AUTOEKG, and AUTOEKG FUEL SYSTEM ANALYZER.  For

example, all three of those marks are used by ITW to promote its AutoEKG product on the

internet at www.autoekg.com.  As of the filing of this action, ITW displays AUTOEKG and the

AutoEKG Mark at www.autoekg.com in conjunction with the "®" symbol, even though ITW has

not received a registration of AUTOEKG or the AutoEKG mark from the USPTO.  As of the

filing of this action, ITW also displays the word mark "AutoEKG® Fuel System Analyzer" at

www.autoekg.com in conjunction with the "®" symbol.  As of the filing of this action, ITW also

states at www.autoekg.com that "AutoEKG® Fuel System Analyzer is a registered trademark of

ITW," but the USPTO has not issued to ITW any federal trademark registration for AUTOEKG

or AUTOEKG FUEL SYSTEM ANALYZER. A copy of the content displayed by ITW at

www.autoekg.com as of the filing of this action is attached hereto as Exhibit 65.

**ITW Copies Thompson Automotive Labs' Scoring Scale and Graphics
Used to Report Results Generated by the Combustion Performance Test Tool**

94.     Prior to ITW's initial contact with Thompson Automotive Labs in 2011,

Thompson Automotive Labs developed and utilized a 1-10 scale for reporting results generated

by its Combustion Performance Test Tool.  Prior to ITW's initial contact with Thompson

Automotive Labs in 2011, Thompson Automotive Labs also employed a graduated red-yellow-

green color scheme in conjunction with its 1-10 scoring scale for reporting results generated by its Combustion Performance Test Tool. Under Thompson Automotive Labs' 1 – 10 scoring scale and graduated red-yellow-green color scheme, results generated by the Combustion Performance Test Tool were and are reported with the color red associated with a need for remedial fuel system service, the color yellow associated with a need for preventative fuel system maintenance, and the color green associated with no fuel system service needed.

95.     The 1 – 10 scale and the graduated red-yellow-green color scheme used by Thompson Automotive Labs for reporting results generated by the Combustion Performance Test Tool are inherently distinctive and, prior to the launch of the AutoEKG Product, were associated with Thompson Automotive Labs and its Combustion Performance Test Tool by quick-lube operators and other users of equipment to analyze automotive engine exhaust and automotive engine combustion performance.

96.     The 1 – 10 scale and graduated red-yellow-green color scheme used by Thompson Automotive Labs for reporting results generated by its Combustion Performance Test Tool are nonfunctional.

97.     Like the Combustion Performance Test Tool produced by Thompson Automotive Labs, ITW employs a 1 – 10 scale for reporting results generated by its AutoEKG Product. Like the Combustion Performance Test Tool produced by Thompson Automotive Labs, ITW also uses a graduated red-yellow-green color scheme in conjunction with its 1 -10 scoring scale for reporting results generated by the AutoEKG Product. Under the graduated red-yellow-green color scheme used by ITW, results generated by the AutoEKG Product are reported, as with the Combustion Performance Testing Tool, with the color red associated with a need for remedial

fuel system service, the color yellow associated with a need for preventative fuel system maintenance, and the color green associated with no fuel system service needed.

98.     The 1 – 10 scale and graduated red-yellow-green color scheme used by ITW for reporting results generated by the AutoEKG Product are substantially and confusingly similar to the 1 – 10 scoring scale and graduated red-yellow-green color scheme adopted and used by Thompson Automotive Labs for reporting results generated by its Combustion Performance Test Tool before ITW's AutoEKG Product was launched and which continues in use by Thompson Automotive Labs today.

### ITW's Sales of Its AutoEKG Product and Related Products

99.     Upon information and belief, ITW has sold or leased to quick-lube outlets and other customers at least 200 units of its AutoEKG Product.

100.     Upon information and belief, ITW has generated revenues and profits through the sale or lease of its AutoEKG Product.

101.     Upon information and belief, one term of ITW's sale or lease of at least some units of its AutoEKG Product is a requirement that the buyer or lessee also acquire from ITW certain automotive supplies and other products, such as fuel cleaning treatments.  Upon information and belief, ITW's sale of such automotive supplies and other products to buyers or lessees of its AutoEKG Product has generated revenues and profits for ITW.

102.     Upon information and belief, ITW has provided its AutoEKG Product to some quick-lube outlets and other customers at no charge, conditioned upon the customer's agreement to purchase from ITW certain automotive supplies, such as fuel cleaning treatments.  Upon information and belief, ITW's sale of such automotive supplies to customers purchasing, leasing or using its AutoEKG Product at no charge has generated revenues and profits for ITW.

44

103.    Upon information and belief, using advertising and other materials prepared and specifically intended for their use by ITW, quick-lube outlets have advertised and have sold fuel system analysis and cleaning services based upon test results generated by the AutoEKG Product using the AutoEKG Mark, AUTOEKG, and the 1 – 10 scale and graduated red-yellow-green color scheme employed by ITW for reporting results generated by the AutoEKG Product, generating revenues and profits as a result.

### FIRST CLAIM FOR RELIEF
### BREACH OF CONTRACT

104.    Thompson Automotive Labs restates as if fully set forth here each and every allegation set forth above in paragraphs 1 through 103, inclusive.

105.    The Exclusive Supply Agreement was a valid and binding contract between Thompson Automotive Labs and ITW.

106.    ITW breached the Exclusive Supply Agreement by, *inter alia:*

   a.   wrongfully purporting to terminate the Exclusive Supply Agreement without justification therefor;

   b.   wrongfully failing and refusing to make minimum monthly purchases of Combustion Performance Test Tools as and when required by the Exclusive Supply Agreement; and

   c.   wrongfully failing and refusing to pay amounts owed to Thompson Automotive Labs under the Exclusive Supply Agreement as and when such amounts were due.

107.    As a direct and proximate result of ITW's breaches of the Exclusive Supply Agreement, Thompson Automotive Labs has sustained damages in an amount to be proved at trial.

## SECOND CLAIM FOR RELIEF
## TRADEMARK AND TRADE DRESS INFRINGEMENT

108.    Thompson Automotive Labs restates as if fully set forth here each and every allegation set forth above in paragraphs 1 through 107, inclusive.

109.    Commencing before ITW's launch of its AutoEKG Product and ITW's first uses of AUTOEKG and the AutoEKG Mark, and continuing through and including the present, Thompson Automotive Labs has used the trademarks LIKE AN EKG FOR AN ENGINE and the EKG Line Design, to identify, market, advertise and promote its Combustion Performance Test Tool in interstate commerce.  Thompson Automotive Labs is the owner of the valuable trademarks LIKE AN EKG FOR AN ENGINE and the EKG Line Design, and they have become associated with Thompson Automotive Labs and its Combustion Performance Test Tool among quick lube operators and other users of equipment to analyze automotive engine exhaust and automotive engine combustion performance through their continuous and extensive use by Thompson Automotive Labs in connection with its Combustion Performance Test Tool. Thompson Automotive Labs is entitled to the exclusive use of the trademarks LIKE AN EKG FOR AN ENGINE and the EKG Line Design in connection with the marketing, advertising, offer for sale and sale of equipment to analyze automotive engine exhaust and automotive engine combustion performance.

110.    Commencing before ITW's launch of its AutoEKG product and ITW's first use of a 1 – 10 scale and a graduated red-yellow-green color scheme for reporting results generated by its AutoEKG Product, and continuously through and including the present, Thompson Automotive Labs has used a 1 – 10 scale and graduated red-yellow-green color scheme for reporting results generated by its Combustion Performance Test Tool.  The 1 – 10 scale and graduated red-yellow-green color scheme for reporting results generated by Thompson

Automotive Labs' Combustion Performance Test Tool constitute valuable, distinctive and protectable trade dress associated with Thompson Automotive Labs and its Combustion Performance Test Tool and are used by Thompson Automotive Labs to identify, market, advertise and promote its Combustion Performance Test Tool in interstate commerce. The 1 – 10 scale and graduated red-yellow-green color scheme used to report results generated by Thompson Automotive Labs' Combustion Performance Tool have become associated with Thompson Automotive Labs and its Combustion Performance Test Tool among quick lube operators and other users of equipment to analyze automotive engine exhaust and automotive engine combustion performance through their continuous and extensive use by Thompson Automotive Labs in connection with its Combustion Performance Test Tool. Thompson Automotive Labs is entitled to the exclusive use of a 1 – 10 scale and graduated red-yellow-green color scheme for reporting results generated by equipment to analyze automotive engine exhaust and automotive engine combustion performance.

111.    Without Thompson Automotive Labs' consent, ITW has used and is using the confusingly similar AutoEKG Mark, AUTOEKG, AUTOEKG FUEL SYSTEM ANALYZER, THE AUTOEKG FUEL SYSTEM ANALYZER and the domain name www.autoekg.com in commerce to identify, advertise, market, promote, sell and offer for sale equipment to analyze automotive engine exhaust and automotive engine combustion performance which directly competes with Thompson Automotive Labs' Combustion Performance Test Tool.

112.    Without Thompson Automotive Labs' consent, ITW has used and is using a confusingly similar 1 – 10 scale and graduated red-yellow-green color scheme for reporting results generated by equipment to analyze automotive engine exhaust and automotive engine

combustion performance which directly competes with Thompson Automotive Labs' Combustion Performance Test Tool.

113. ITW's use of the AutoEKG Mark, AUTOEKG, AUTOEKG FUEL SYSTEMTN ANALYZER, THE AUTOEKG FUEL SYSTEM ANALYZER and the domain name www.autoekg.com to identify, advertise, promote, sell and offer for sale equipment to measure automotive engine exhaust and automotive engine combustion performance is likely to cause confusion, or to cause mistake, or to deceive quick lube operators and other purchasers, lessees and users of equipment as to the source of ITW's AutoEKG Product, its sponsorship by Thompson Automotive Labs, the affiliation of Thompson Automotive Labs with ITW's AutoEKG Product, or Thompson Automotive Labs' approval of ITW's AutoEKG Product. ITW's use of the confusingly similar AutoEKG Mark, AUTOEKG, AUTOEKG FUEL ANALYZER SYSTEM, THE AUTOEKG FUEL SYSTEM ANALYZER and the domain name www.autoekg.com to identify, advertise, promote, sell and offer for sale equipment to analyze automotive engine exhaust and automotive engine combustion performance constitutes infringement of Thompson Automotive Labs' LIKE AN EKG FOR AN ENGINE trademark and EKG Line Design and unfair competition in violation of 15 U.S.C. §1125(a) and common law.

114. ITW's use of a 1 – 10 scale and graduated red-yellow-green color scheme for reporting results generated by equipment to analyze automotive engine exhaust and automotive engine combustion performance is likely to cause confusion, to cause mistake, or to deceive quick lube operators and other purchasers, lessees and users of such equipment as to the source of ITW's AutoEKG Product, its sponsorship by Thompson Automotive Labs, the affiliation of Thompson Automotive Labs with ITW's AutoEKG Product, or Thompson Automotive Labs' approval of ITW's AutoEKG Product. ITW's use of a confusingly similar 1 – 10 scale and

graduated red-yellow-green color scheme for reporting results generated by equipment to
measure automotive engine exhaust and automotive engine combustion performance constitutes
infringement of Thompson Automotive Labs' trade dress and unfair competition in violation of
15 U.S.C. §1125(a) and common law.

115. ITW's infringement of Thompson Automotive Labs' LIKE AN EKG FOR AN
ENGINE trademark, EKG Line Design and trade dress alleged herein has been knowing, willful
and intentional.

116. As a direct and proximate result of ITW's infringement of Thompson Automotive
Labs' LIKE AN EKG FOR AN ENGINE trademark, EKG Line Design, and trade dress,
Thompson Automotive Labs has sustained damages in an amount to be proved at trial.

117. Upon information and belief, through its infringement of Thompson Automotive
Labs' LIKE AN EKG FOR AN ENGINE trademark, EKG Line Design and trade dress, ITW
has generated profits and has been unjustly enriched.

118. As a direct and proximate result of ITW's infringement of Thompson Automotive
Labs' LIKE AN EKG FOR AN ENGINE trademark, EKG Line Design and trade dress,
Thompson Automotive Labs has sustained irreparable injury to its business, reputation and
goodwill and will continue to do so unless and until ITW's infringement is enjoined.

**THIRD CLAIM FOR RELIEF**
**INDUCEMENT OF TRADEMARK AND TRADE DRESS INFRINGEMENT**

119. Thompson Automotive Labs restates as if fully set forth here each and every
allegation set forth above in paragraphs 1 through 118, inclusive.

120. ITW has intentionally induced quick lube operators and other purchasers, lessees
and users of its AutoEKG Product to identify, promote, advertise, market, sell and offer for sale
fuel system analysis and cleaning services using the confusingly similar AutoEKG Mark,

AUTOEKG, and THE AUTOEKG FUEL SYSTEM ANALYZER.  ITW also has intentionally

induced quick lube operators and purchasers, lessees and other users of its AutoEKG product to

use a confusingly similar 1 – 10 scale and graduated red-yellow-green color scheme for reporting

results generated by the AutoEKG Product to identify, promote, advertise, market, sell and offer

for sale fuel system analysis and cleaning services.  ITW has done so intentionally, willfully and

with knowledge of Thompson Automotive Labs' LIKE AN EKG FOR AN ENGINE trademark,

EKG Line Design and trade dress, as alleged above.

     121.    The use of the AutoEKG Mark, AUTOEKG, and THE AUTOEKG FUEL

SYSTEM ANALYZER by quick lube operators and other purchasers, lessees and users of ITW's

AutoEKG Product to identify, promote, advertise, market, sell and offer for sale fuel system

analysis and cleaning services, as well as the use of a 1 – 10 scale and graduated red-yellow-

green color scheme for reporting results generated by the AutoEKG Product are likely to cause

confusion among consumers of fuel system analysis and cleaning services as to the source of

ITW's AutoEKG Product, its sponsorship by Thompson Automotive Labs, its affiliation with

Thompson Automotive Labs, or Thompson Automotive Labs' approval of  ITW's AutoEKG

Product.  The use of the confusingly similar AutoEKG Mark, AUTOEKG, and THE AUTOEKG

FUEL SYSTEM ANALYZER by quick lube operators and other purchasers, lessees and users of

ITW's AutoEKG Product to identify, advertise, promote, sell and offer for sale fuel system

analysis and cleaning services, as well as the use of a confusingly similar 1 – 10 scale and

graduated red-yellow-green color scheme for reporting results generated by the AutoEKG

Product, constitutes infringement of Thompson Automotive Labs' LIKE AN EKG FOR AN

ENGINE trademark, EKG Line Design, and trade dress and unfair competition in violation of 15

U.S.C. §1125(a) and common law, for which ITW is liable due to its willful, intentional and knowing inducement and direction of such infringement.

122.     As a direct and proximate result of the infringement of Thompson Automotive Labs' LIKE AN EKG FOR AN ENGINE trademark, EKG Line Design, and trade dress by quick lube operators and other purchasers, lessees and users of ITW's AutoEKG Product, Thompson Automotive Labs has sustained damages in an amount to be proved at trial, for which ITW is liable due to its willful, intentional and knowing inducement and direction of such infringement.

123.     As a direct and proximate result of the infringement of Thompson Automotive Labs' LIKE AN EKG FOR AN ENGINE trademark, the EKG Line Design, and trade dress by quick lube operators and other purchasers, lessees and users of ITW's AutoEKG Product, such quick lube operators and other purchasers, lessees and users of ITW's AutoEKG Product have generated profits and have been unjustly enriched, for which ITW is liable due to its willful, intentional and knowing inducement and direction of such infringement.

124.     As a direct and proximate result of ITW's willful, intentional and knowing inducement of infringement of Thompson Automotive Labs' LIKE AN EKG FOR AN ENGINE trademark, the EKG Line Design, and trade dress by quick lube operators and other purchasers, lessees and users of ITW's AutoEKG Prouct, Thompson Automotive Labs has sustained irreparable injury to its business, reputation and goodwill and will continue to do so unless and until ITW's inducement and direction of such infringement is enjoined.

**FOURTH CLAIM FOR RELIEF**
**FALSE ADVERTISING AND UNFAIR COMPETITION**

125.     Thompson Automotive Labs restates as if fully set forth here each and every allegation set forth above in paragraphs 1 through 124, inclusive.

126.     In commercial advertising and promotion, ITW has stated that the use of its AutoEKG Product is a "PROVEN PROFIT PROGRAM" that is demonstrated by field trials of the AutoEKG product involving more than 300 outlets nationwide.  Upon information and belief, these and similar statements alleged herein were false and misleading, in that (a) at the time such statements were made, the AutoEKG Product was not a proven profit program and (b) at the time such statements were made the AutoEKG Product had not been used in field trials involving more than 300 outlets nationwide.  Rather, upon information and belief, the field trials and the monetary results of such field trials referenced in such statements related to the Combustion Performance Test Tool produced by Thompson Automotive Labs.

127.     In commercial advertising and promotion, ITW has stated to Jiffy Lube Int'l, which ITW intended to be communicated by Jiffy Lube Int'l to all Jiffy Lube® franchisees, that "[a]fter technical testing by our lab . . . we no longer have confidence in the readings the [TAL CPT] units provide."  This statement was false and misleading in that, upon information and belief, ITW had not conducted technical testing of the Thompson Automotive Labs Combustion Performance Test Tool in its lab and had no basis for a statement that it had thereby lost confidence in the readings that the Combustion Performance Test Tool provided.

128.     In commercial advertising and promotion, ITW has displayed the AutoEKG Mark, AUTOEKG, AUTOEKG FUEL SYSTEM ANALYZER and THE AUTOEKG FUEL SYSTEM ANALYZER with the "®" symbol and has stated that "The AutoEKG® Fuel System Analyzer is a registered trademark of ITW."  These statements were false and misleading because neither the AutoEKG Mark, AUTOEKG, AUTOEKG FUEL SYSTEM ANALYZER nor THE AUTOEKG FUEL SYSTEM ANALYZER are federally registered trademarks with the USPTO.

129.    These statements were material, had the capacity to deceive potential customers, and upon information and belief deceived potential customers, in that they falsely described the nature and characteristics of the AutoEKG Product and falsely described the legitimacy of ITW's rights to market equipment for analyzing automotive engine exhaust or for analyzing automotive engine combustion performance using the AutoEKG Mark, AUTOEKG, AUTOEKG FUEL SYSTEM ANALYZER or THE AUTOEKG FUEL SYSTEM ANALYZER.

130.    ITW is liable to Thompson Automotive Products for false advertising pursuant to 15 U.S.C. §1125(a) and common law.

131.    As a direct and proximate result of ITW's false advertising alleged herein, Thompson Automotive Products has been injured in its business in an amount to be proved at trial.

132.    As a direct and proximate result of ITW's false advertising alleged herein, ITW has generated profits and has been unjustly enriched.

133.    As a direct and proximate result of ITW's false advertising, Thompson Automotive Labs has sustained irreparable injury to its business, reputation and goodwill and will continue to do so unless and until ITW's false advertising is enjoined.

**FIFTH CLAIM FOR RELIEF**
**VIOLATIONS OF N.C. GEN. STAT. § 75-1.1, ET SEQ.**

134.    Thompson Automotive Labs restates as if fully set forth here each and every allegation set forth above in paragraphs 1 through 133, inclusive.

135.    Upon information and belief, after Thompson Automotive Labs declined ITW's low-ball offer to purchase the Combustion Performance Test Tool technology in February 2012, ITW devised a secret plan to obtain from a competitor of Thompson Automotive Labs the rights to a product competitive with the Combustion Performance Test Tool and, using dishonest and

unlawful means, to rid itself of its financial obligations to Thompson Automotive Labs under the Exclusive Supply Agreement. ITW also undertook to wrongfully deprive Thompson Automotive Labs of its market position and goodwill among Jiffy Lube Int'l, Jiffy Lube® franchisees and other quick-lube customers and to usurp Thompson Automotive Labs' market position and goodwill to itself by defaming the Combustion Performance Test Tool; by introducing and advertising, marketing, promoting, offering for sale and selling its competitive product using the infringing name AUTOEKG, the infringing AutoEKG Mark, and infringing trade dress; by falsely representing to prospective purchasers and lessees of the AutoEKG Product that it was a "PROVEN PROFIT PROGRAM" demonstrated by field tests in over 300 outlets nationwide; and by falsely representing that its use of the AutoEKG Mark, AUTOEKG and THE AUTOEKG FUEL SYSTEM ANALYZER were federally-registered trademarks when, in fact, they were not.

136. ITW's activities alleged herein were and are in or affecting commerce in North Carolina and constitute unfair and deceptive trade practices in violation of N.C. Gen. Stat. §75-1.1, *et seq.*

137. As a direct and proximate result, Thompson Automotive Labs has sustained damage in its business or property in an amount to be proved at trial, which amount should be trebled pursuant to N.C. Gen. Stat. §75-16.

138. As a direct and proximate result, Thompson Automotive Labs has sustained irreparable injury to its business, reputation and goodwill and will continue to do so unless and until ITW's unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1, as alleged herein, are enjoined.

139.    ITW's activities alleged herein that constitute unfair and deceptive trade practices in violation of N.C. Gen. Stat. §75-1.1 were willful, and there has been an unwarranted refusal by ITW to resolve the matter that is the subject of this action.  Thompson Automotive Labs therefore is entitled, pursuant to N.C. Gen. Stat. § 75-16.1, to recover its reasonable attorneys' fees incurred in connection with this action.

WHEREFORE, Thompson Automotive Labs requests:

(a)    Entry of judgment in its favor against ITW on each and every claim for relief set forth herein;

(b)    An award of compensatory damages in an amount to be proved at trial;

(c)    Entry of an order directing ITW (i) to account to Thompson Automotive Labs for all profits earned by ITW in association with its infringement of Thompson Automotive Labs' trademarks and trade dress and (ii) to disgorge such profits to Thompson Automotive Labs;

(d)    Entry of an order directing ITW (i) to account to Thompson Automotive Labs for all profits earned by purchasers, lessees and other users of the AutoEKG Product in association with infringement of Thompson Automotive Labs' trademarks and trade dress and (ii) to disgorge such profits to Thompson Automotive Labs;

(e)    Entry of an order directing ITW (i) to account to Thompson Automotive Labs for all profits earned by ITW in association with its false advertising relating to the AutoEKG Product and (ii) to disgorge such profits to Thompson Automotive Labs;

(f)    An award of up to three times all damages awarded to Thompson Automotive Labs for ITW's trademark infringement, false advertising and unfair competition in violation of 15 U.S.C. §1125(a);

(g)    An award of treble damages pursuant to N.C. Gen. Stat. §75-16;

(h)     Entry of an order permanently enjoining ITW, and all of its officers, directors, agents, employees, servants and attorneys, and all persons in active concert with them, from using any mark, word, term, name, symbol, or device identical, substantially identical or confusingly similar to LIKE AN EKG FOR AN ENGINE, alone or in combination with any other term, symbol, and/or design, including but not limited to EKG, AUTOEKG, the AutoEKG Mark, AUTOEKG FUEL SYSTEM ANALYZER, THE AUTOEKG FUEL SYSTEM ANALYZER and the domain name www.autoekg.com in connection with the marketing, promotion, advertising, sale or offer for sale of any equipment for analyzing automotive engine exhaust or automotive engine combustion efficiency, including but not limited to the AutoEKG Product;

(i)     Entry of an order permanently enjoining ITW, and all of its officers, directors, agents, employees, servants and attorneys, and all persons in active concert with them, from using any mark, word, term, name, symbol, or device identical, substantially identical or confusingly similar to the EKG Line Design, alone or in combination with any other term, symbol, and/or design, including but not limited to the AutoEKG Mark, in connection with any equipment for analyzing automotive engine exhaust or automotive engine combustion efficiency, including but not limited to the AutoEKG Product;

(j)     Entry of an order permanently enjoining ITW, and all of its officers, directors, agents, employees, servants and attorneys, and all persons in active concert with them, from using, in connection with any equipment for analyzing automotive engine exhaust or automotive engine combustion efficiency, including the AutoEKG Product, any trade dress identical, substantially identical or confusingly similar to the trade dress of the Combustion Performance Test Tool produced by Thompson Automotive Labs;

56

(k) Entry of an order directing ITW, and its officers, directors, agents, employees, agents, servants and attorneys, and all persons in active concert with them, deliver to the Clerk of Court for destruction all goods, papers, advertisements, marketing or promotional materials, manuals, paraphernalia, and other articles in their possession, custody or control displaying any mark that infringes LIKE AN EKG FOR AN ENGINE or the EKG Line Design or that infringes Thompson Automotive Labs' trade dress associated with the Combustion Performance Test Tool;

(l) Entry of an order directing ITW, its officers, directors, agents, employees, servants and attorneys, and all persons in active concert with them, to take all steps necessary to remove from www.youtube.com and other internet sites all videos or electronic files displaying any mark, word, term, name, symbol, or device identical, substantially identical or confusingly similar to LIKE AN EKG FOR AN ENGINE or the EKG Line Design, alone or in combination with any other term, symbol, and/or design, including but not limited to the AutoEKG Mark, AUTOEKG, AUTOEKG FUEL SYSTEM ANALYZER, and THE AUTOEKG FUEL SYSTEM ANALYZER;

(m) Entry of an order directing ITW, its officers, directors, agents, employees, servants and attorneys, any persons in active concert with them, to take all steps necessary to transfer and assign to Thompson Automotive Labs the domain name www.autoekg.com;

(n) Entry of an order directing ITW, its officers, directors, agents, employees, servants and attorneys, and any persons in active concert with them, to take all steps necessary to withdraw U.S. Trademark Registration Application No. 86346900;

(o) Entry of an order permanently enjoining ITW, its officers, directors, agents, employees, servants and attorneys, and any persons in active concert with them, from any and all

false or misleading advertising in connection with the marketing, promotion, offer for sale or sale of the AutoEKG Product;

(p)    An award of reasonable attorneys' fees incurred by Thompson Automotive Labs in connection with this action as may be allowed by law;

(q)    An award of all costs incurred by Thompson Automotive Labs in connection with this action;

(r)    An award of prejudgment and postjudgment interest; and

(s)    Such other and further relief as the Court may deem just and proper.


## DEMAND FOR JURY TRIAL

Thompson Automotive Labs hereby demands trial by jury as to all issues in this action so triable as of right.


This the 24th day of June, 2015.

/s/ Robert J. Morris
Robert J. Morris
N.C. State Bar No. 15981
jmorris@smithlaw.com
Christopher G. Smith
N.C. State Bar No. 22767
Addie S. Ries
aries@smithlaw.com
N.C. State Bar No. 31759
SMITH ANDERSON BLOUNT DORSETT
MITCHELL & JERNIGAN, LLP
2300 Wells Fargo Capitol Center
150 Fayetteville Street
Raleigh, North Carolina 27601
Telephone: (919) 821-1220
Facsimile: (919) 821-6800

Attorneys for Thompson Automotive Labs, LLC

58